## QUIGLEY v. UNITED STATES.

### ISBISTER v. SAME.

Circuit Court of Appeals, First Circuit.
May 17, 1927.

Nos. 2102, 2103.

**1. Witnesses ⊜267—Limits of cross-examination are largely discretionary with trial court.**

The limits of cross-examination, to affect credibility, must always be left largely within the discretion of the trial court.

**2. Criminal law ⊜1169(5)—Generally error in admission of incompetent evidence is cured by withdrawal or instruction to disregard.**

The general rule is that, if evidence has been erroneously admitted, the error is cured by its subsequent withdrawal or by clear, peremptory instruction to disregard it, but the rule is subject to exception where the appellate court can perceive that such evidence made such a strong impression on the jury that the withdrawal or instruction to disregard it probably failed to eradicate its effect.

**3. Criminal law ⊜1169(5)—Error, if any, in admitting affidavit containing statements inconsistent with statements of defendants' witness and limited to affect his credibility, held not prejudicial.**

Error, if any, in admitting affidavit containing various charges of corruption and crime against defendants which was plainly inconsistent with statement of defendants' witness that he had never made any statement about any of defendants, and which court admitted only on question of credibility of witness, held not prejudicial.

**4. Conspiracy ⊜47—Evidence held to sustain conviction for conspiracy to violate National Prohibition Act.**

Conviction of conspiracy to violate National Prohibition Act, tit. 2, §§ 3, 6, 21, 25, 26,

33 (Comp. St. §§ 10138½aa, 10138½c, 10138½jj, 10138½m, 10138½mm, 10138½t), *held* supported by the evidence and the trial free from any error which affected substantial rights of defendants.

In Error to the District Court of the United States for the District of Massachusetts; George F. Morris, Judge.

Criminal prosecution by the United States against Thomas Quigley, and others, for conspiracy to violate the National Prohibition Act. Judgment of conviction, and defendants Quigley and others and Isbister separately bring error. Affirmed.

See, also, 9 F.(2d) 411.

Leo Rogers, of Boston, Mass., for Quigley and others.

Arthur Harrington and Cornelius F. Keating, both of Boston, Mass., for Isbister.

John V. Spalding, Asst. U. S. Atty., of Boston, Mass. (Frederick H. Tarr, U. S. Atty., of Gloucester, Mass., on the brief), for the United States.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. The defendants, with some thirty others, were indicted for conspiracy to violate sections 3, 6, 21, 25, 26, and 33 of title 2 of the National Prohibition Act (Comp. St. §§ 10138½aa, 10138½c, 10138½jj, 10138½m, 10138½mm, 10138½t), by possessing, manufacturing, selling, transporting and importing intoxicating liquor, during the period from January 10, 1922, to August 7, 1925. At a previous trial, some of the defendants were eliminated by pleas of guilty and verdicts of not guilty. Inferentially, the jury disagreed as to others. At a second trial, in June and July, 1926, Thomas Quigley, Edward Carlon, Lawrence F. Quigley, Walter A. Barden, Edward W. Isbister, Harry Murphy, Edward Forbes, John McGreevey, Eli Weinstein, Frank Goldman, William Wall, Louis Sears, William Geller, and Ned O'Keefe were tried. The jury returned verdicts of guilty against Thomas Quigley, Edward Carlon, Edward W. Isbister, Frank Goldman, and Ned O'Keefe, and verdicts of not guilty as to Louis Sears (under direction of the court), and as to Walter A. Barden, Edward Forbes, John McGreevey, Eli Weinstein, William Wall, and William Geller, and disagreed as to Lawrence F. Quigley and Harry Murphy. Sentences were imposed as follows: Thomas Quigley, eighteen months in the United States penitentiary in Atlanta and a fine of $700; Edward Carlon, eigh-

teen months at Atlanta; Edward W. Isbister, eighteen months and a fine of $700; and Ned O'Keefe, fifteen months in Atlanta.

The case comes here on two writs of error—one by Thomas Quigley, Edward J. Carlon, and William E. Keefe (No. 2102), and the other by Edward W. Isbister (No. 2103). In No. 2102 are 58 assignments of error; in No. 2103, 25 assignments of error. The record, including certain unnecessary duplications, contains over 700 pages, made up largely of evidence from over 50 witnesses. The judge's charge, covering over 30 pages, is unusually full, clear, and instructive. But at the end of the charge counsel for the defendants saved, or undertook to save, in blanket form, exceptions to 109 requests so far as not covered by the charge.

The nature of the case shown by the evidence cannot be better stated than by quoting from the charge:

"The chain of circumstances which the government contends establishes a conspiracy on the part of officials of the city of Chelsea and others to possess, sell, and encourage the sale of intoxicating liquor, and to collect money for the protection of the violators of the prohibitory act, briefly stated, appear to the court as follows:

"First. There were elections for mayor in the city of Chelsea.

"Second. There is evidence tending to show that Lawrence F. Quigley and his political associates, some of whom are defendants in this case, were trying to obtain money, and did obtain money, from persons who were in the liquor business, and from others who contemplated entering the business, for the purpose of financing Lawrence F. Quigley's campaign.

"Third. That the mayor-elect, as executive head of the city government, and certain of the police officers, including the mayor's brother, Tom Quigley, were not vigilant in certain sections of the city in the prosecution of liquor violations.

"Fourth. That violation of the state prohibitory laws by certain persons, well known to the police to be consistent rum sellers with records, were open, notorious, and continuous for months.

"Fifth. That protection money was being collected from persons engaged in the unlawful sale of liquor.

"Sixth. That large quantities of liquor were unloaded from boats in the presence of police officers and some others of these defendants.

"Seventh. That close friends and associates of the mayor, and certain of the police officers, were actually engaged in the distri-

bution of intoxicating liquor and in sales at prices above the market.

"Eighth. That, when prosecutions were instituted, persons other than the real offenders were brought into court.

"Ninth. That liquors purchased from persons connected with the scheme were sold by those paying protection, with full knowledge of the police, so long as they made their payments for protection.

"Tenth. That failure to pay for protection was the signal for raids and prosecutions.

"From this chain of circumstances the government would have you draw the inference that there was a tacit agreement between Lawrence F. Quigley, certain police officers of the city, Edward Carlon, Harry Murphy, Ned O'Keefe, and others, to violate and aid and assist others in the violation of the National Prohibition Act."

On such a record, only a plain and substantial error would warrant an appellate court in reversing the judgment below. We find no such error. In their briefs and oral arguments, counsel have in effect been constrained to abandon all contentions except two. At any rate, if not abandoned, the rest are plainly untenable.

The defendants' chief reliance is of error in the rulings made on the cross-examination of Namet, a witness for the defendants. Percy Friedman was one of the government's principal witnesses. His evidence fills nearly 200 pages of the record. He was then serving a sentence in state prison. He gave, in general and in detail, evidence supporting the government's case as outlined above. To break the force of his evidence, Namet, who also had served a year in jail, was called by Isbister, and testified to conversation with Friedman, in which Friedman had said, in substance, that, in order to get his term in prison shortened, he was "coming up here to crucify them"; that five or six times he said he was going to do a real job on these men—the defendants, or some of them. On cross-examination by the United States attorney, the record proceeds:

"X-Q. 101. So Mr. Friedman told you that he was going to do a job on some of these defendants, did he? A. Yes, sir.

"X-Q. 102. You never intimated that you would, did you? A. No, sir.

"X-Q. 103. You never made any statement about any of these defendants, did you? A. No, sir.

"X-Q. 104. You didn't put down in writing for Mr. Goldman what you were going to say about some of these defendants, did you? A. Not in regard to this case; no, sir.

"X-Q. 105. You never made any statement in regard to this case, did you? A. No, sir.

"X-Q. 106. When did you get out of the Salem jail? A. January.

"X-Q. 107. Of this year? A. Yes, sir.

"X-Q. 108. Did you sign a paper? A. Yes, sir.

"Mr. Rogers: May I pray your honor's judgment?

"X-Q. 109. That is your name [indicating]? A. Yes, sir.

"Mr. Rogers: Your honor's ruling with reference to the direct examination has application, does it not, to the cross-examination as well?

"The Court: I don't know what ruling you refer to.

"Mr. Rogers: I understand you made a ruling that the testimony of this witness was competent only to discredit the witness Friedman. I assume the same ruling will apply?

"The Court: Now the district attorney is undertaking to discredit this particular witness.

"Mr. Rogers: Yes, sir.

"The Court: And that is as far as the testimony can be taken.

"Mr. Rogers: It cannot be received as against any of the defendants in this case?

"The Court: No; I don't think it can be, not as substantive testimony.

"X-Q. 110. Now, you tell me if what I am now reading over your signature, is not what you said when you were conferring with Mr. Goldman and Mr. Leonard in connection with this case?

* * * * * * * *

"Mr. Williams: I am going to ask him what is written here over his signature.

"Mr. Drinkwater: I am asking you if you are going to offer it.

"The Court: Instead of asking him to read it, you read it, Mr. District Attorney, and ask him if he made the statement.

"Mr. Williams: All right, sir.

"The Court: That is a quicker way of getting at that, and a better way.

"X-Q. 110 (continued, reading). 'I the undersigned, make the following statement, voluntarily and without any promise or hope or reward:

"'That my name is David Namet—'

"Mr. Drinkwater: Just a moment. I object to the reading of that, if your honor please. I have a right to examine that and find out whether it should be read or not, if your honor please.

"The Court: You have.

"Mr. Drinkwater: My brother has not offered to allow me to examine it.

"Mr. Williams: No; and I do not intend to, sir.

"The Court: Well, I think instead of the district attorney starting in to read the whole of it, the portions that should be read, and questions asked the witness, should be such as tend to contradict the testimony that he has now given on the witness stand. Other portions of the affidavit, if that is what it is, are not admissible.

"Mr. Williams: He has stated that he has not made any statement to a government agent in regard to this case, in regard to what he intended to testify.to. Now, I propose to present this statement to him, over his signature, if your honor please.

"The Court: You can present such portions of it as tend to contradict the testimony that he has already given on the witness stand.

"Mr. Drinkwater: Do I still understand that my brother does not want to allow me to examine that?

"The Court: Well, you may examine it and see what connection the different questions may have. Go ahead, Mr. District Attorney.

"X-Q. 110 (continued, reading). 'I, the undersigned—'

"Mr. Drinkwater: Just a moment, please.

"The Court: Go ahead.

## "Exception 14.

"Mr. Drinkwater: May I have an exception to that?

"The Court: You may have an exception.

"Mr. Voke: For all the defendants, if your honor please?

"The Court: You may have an exception. This testimony is admitted only for the purpose of contradicting this witness, what he said on the witness stand."

Defendants complain that they were not allowed to examine Namet's affidavit before it was read by the United States attorney. The court ruled twice that they had that right; why they did not exercise it is not entirely clear. The United States attorney's statement that he did not intend to allow counsel to examine it was of course improper, and should not have been made. But, as counsel saved exceptions to the matter read by the United States attorney in the presence of the jury, the real question is whether the evidence was incompetent for the purpose for which the court admitted and limited it.

The affidavit contained various charges of corruption and crime against the Quigleys, Isbister, and others whose rights are not now involved. It was plainly inconsistent with Namet's statement, supra, that he "never made any statement about any of these defendants." After its reading, the court ruled:

"The Court: Well, it has been admitted, and gentlemen of the jury, it will be allowed to stand, but you must not take it as testimony against other individuals. It is only admitted for the purpose of contradiction, and showing the attitude of the witness who is giving the testimony on the witness stand, on the question of his credibility, and that alone."

And in his charge the court said:

"On cross-examination, the witness Namet was confronted by a signed statement that he had previously made in the district attorney's office. There were some things in the statement involving irregularities at the polls in Chelsea, and statements with reference to Lawrence Quigley and Tom Quigley. So far as this statement makes any mention of either of these defendants, or of irregularities at the polls, entirely disconnected with this alleged conspiracy, it has absolutely no bearing upon the case, and should not be considered by you as proof of any of the incidents mentioned in the statement. It was admitted, and its sole use is, for the purpose of showing the changed state of mind of the witness Namet between the time the statement was given and the time of this trial, and it may be used only for the purpose of contradicting or impeaching the testimony of the witness Namet, and such portions as do not contradict him you should strike from your minds, and you must not consider them."

[1, 2] The limits of cross-examination to affect credibility must always be left largely within the discretion of the trial court. Considering this unusual record of wide-spread lawlessness, we cannot say that the account in this affidavit of analogous wrongdoing, not covered by the indictment, prejudiced the jury in determining the rights of these defendants. The case does not in this regard fall within the exception to the general rule stated by Circuit Judge Sanborn in Maytag v. Cummins (C. C. A.) 260 F. 74, 82, cited and relied upon by defendants' counsel:

"The general rule is that, if evidence has been erroneously admitted during the trial, the error of its admission is cured by its subsequent withdrawal before the close of the trial or by a clear peremptory instruction to the jury to disregard it. Pennsylvania Co. v. Roy, 102 U. S. 451, 26 L. Ed. 141; Specht

v. Howard, 16 Wall. 564, 21 L. Ed. 348; Washington Gaslight Co. v. Lansden, 172 U. S. 534, 555, 19 S. Ct. 296, 43 L. Ed. 543; Turner v. American Security & Trust Co., 213 U. S. 257, 267, 29 S. Ct. 420, 53 L. Ed. 788; Union Pacific Ry.' v. Thomas, 152 F. 365, 371, 81 C. C. A. 491; Balaklala Copper Co. v. Reardon, 220 F. 585, 587, 136 C. C. A. 186; Oates v. United States, 233 F. 201, 204, 147 C. C. A. 207; Looker v. United States, 240 F. 932, 935, 153 C. C. A. 618.

But there is an exception to this rule. It is that, where the appellate court perceives from an examination of the record that the inadmissible evidence made such a strong impression upon the minds of the jury that its subsequent withdrawal or the instruction to disregard it probably failed to eradicate the injurious effect of it from the minds of the jury, there the defeated party did not have a fair trial of his case, and a new trial should be granted. Waldron v. Waldron, 156 U. S. 361, 381, 383, 15 S. Ct. 383, 39 L. Ed. 453; Armour v. Kollmeyer, 161 F. 78, 88 C. C. A. 242, 16 L. R. A. (N. S.) 1110; Chicago, M. & St. Paul Ry. Co. v. Newsome, 174 F. 394, 396, 98 C. C. A. 1; Knickerbocker Trust Co. v. Evans, 188 F. 549, 566, 567, 110 C. C. A. 347."

[3] Our conclusion is that, if there was any error in the treatment of· this affidavit in cross-examination, it did not affect the substantial rights of the parties.

The only other point calling for discussion grows out of the testimony of Friedman as to hi-jacking liquor from the Boston & Albany freightyard, contended not to be charged and shown to be a part of the general conspiracy set out in the indictment. "Hi-jacking" is, in effect, defined by counsel as the lawless acquisition of liquor lawlessly possessed.

It is far from clear that there was not competent evidence connecting this source of the illegal liquor supply with the general conspiracy. But the court in his charge resolved all doubts in favor of the defendants, by saying:

"The testimony of Percy Friedman tends to show that Isbister was one of the police officers who was at the Metropolitan Garage looking out the window while a load of liquor was being landed and transported away from there, and that he and one other remained around there until daylight, and until the job was completed. The rest of Friedman's testimony with respect to Isbister is taken up with what appears to the court to be, in part at least, an independent hi-jacking scheme of liquor that had been landed from a tug, and some of it transported to a freight car in a freightyard. Friedman's testimony with respect to this transaction implicates both Isbister and Forbes, but I have to charge you that, if you find that testimony to be true, it does not constitute the charge set forth in the indictment, unless it is in some way connected with the conspiracy, and it cannot alone furnish the foundation for a verdict of guilty against either Isbister or Forbes."

And again, near the close of the charge:

"I think I made it pretty plain in my charge that this hi-jacking scheme was not a part of this conspiracy, and could not furnish the foundation for a conviction, did I not?

"Mr. Williams: You said so very plainly."

Counsel by silence assented to the view thus expressed by both court and the United States attorney, and cannot now be heard to claim error.

[4] Looking at the record, as we are required to do by section 269 of the Judicial Code (Comp. St. § 1246), "without regard to technical errors, defects or exceptions which do not affect the substantial rights of the parties," we are clear that both court and jury resolved all reasonable doubts in favor of all the defendants, including those now prosecuting those writs of error; and that the judgment below must be affirmed. Holmes v. Goldsmith, 147 U. S. 150, 13 S. Ct. 288, 37 L. Ed. 118; Redmond v. United States (C. C. A.) 8 F.(2d) 24; Weinstein v. United States (C. C. A.) 11 F.(2d) 505.

In each case the judgment of the District Court is affirmed.